IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

BART WAYNE WOODARD                                                    PLAINTIFF

v.                                    Civil No. 6:18-CV-06013

CORRECTIONAL OFFICER McGHEE and                          DEFENDANTS
INMATE TODD RANDALL GREENWAY

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This is a civil rights action provisionally filed pursuant to 42 U.S.C. § 1983.  Pursuant to

the provisions of 28 U.S.C. § 636(b)(1) and (3) (2011), the Honorable Susan O. Hickey, Chief

United States District Judge, referred this case to the undersigned for the purpose of conducting

an evidentiary hearing and making a Report and Recommendation.

An evidentiary hearing was held on September 29, 2020, to consider the matter of

administrative exhaustion of Plaintiff's claims.

## I.        BACKGROUND

Plaintiff, Bart Wayne Woodard ("Woodard"), filed his Complaint on January 31, 2018.

(ECF No. 1).  He alleges his constitutional rights were violated when he was sexually assaulted

and beaten in his cell while incarcerated in the Arkansas Department of Correction ("ADC") -

Ouachita River Unit ("ORCU").  (*Id*. at 8-25).  Woodard alleges this occurred from July 18, 2016

to July 19, 2016.  (*Id*. at 8, 10, 12).  He alleges Defendant McGhee opened his cell door and let

Inmate Greenway and the John Doe inmates into his cell to commit these acts.  (*Id*. at 8).  While

the assault was ongoing, Woodard alleges Defendant McGhee and Inmate Greenway urged the

other inmates on in their activities and gave verbal instructions to them.  (*Id*. at 10, 12).  He further

claims Defendant McGhee used what appeared to be a smartphone to take photos or video of the assault as it occurred.  (*Id*. at 9).

Woodard alleges the John Doe Correctional Offices 1-3 and John Doe Assistant Warden refused to provide him with medical care after the alleged assault from July 18, 2016 to July 25, 2016, accused him of lying and of inflicting the injuries upon himself, and that they threatened him.  (ECF No. 1 at 17-22).  Woodard indicates he did not file an ADC grievance but did file a Prison Rape Elimination Act ("PREA") report.  (*Id*. at 3).  Notably, Woodard does not allege in his Complaint that he was denied access to grievance forms or the grievance process.  Instead, he provides a lengthy narrative describing how he and his sister spoke and wrote to numerous ADC officials but were unable to receive any information as to the disposition of his PREA complaint.  (*Id*. at 3-4).  Woodard's official capacity claims were dismissed pursuant to PLRA preservice screening.  (ECF No. 7).  The Doe Defendants in this case were dismissed on May 10, 2019.  (ECF No. 41).

Defendant McGhee filed his Summary Judgment Motion on June 15, 2018, arguing that Woodard filed no grievances against him pursuant to ADC Administrative Directive ("AD") 14-16 concerning the alleged assault and, therefore, Woodard failed to his exhaust his administrative remedies as required by the PLRA.  (ECF No. 15-2 at 3; ECF No. 16).  Defendant McGhee further argued that the ADC grievance policy (AD 14-16) is a "completely separate" procedure from the ADC's Prison Rape Elimination Act (PREA) Policy, therefore "a PREA complaint does not trigger the grievance process."  (ECF No. 16 at 4).  Defendant McGhee did not attach a copy of Woodard's PREA report as an exhibit to the Motion.

Woodard filed his response to the summary judgment motion on July 11, 2018.  (ECF No. 19).  He did not dispute his failure to file any grievances concerning any of the claims in his

Complaint.  (ECF No. 1 at 3).  Instead, Woodard argued the ADC AD 15-29 PREA Policy is controlling in this case.  Specifically, he stated that AD 15-29 "is the only rule that applies in this case."  (ECF No. 20 at 7-10; ECF No. 21 at 2).  He argued that, under the PREA policy, an inmate has the choice of using either the ADC grievance procedure (AD 14-16) or the PREA procedure (AD 15-29) to report sexual abuse and, therefore, completion of either procedure will satisfy the PLRA exhaustion requirement.  (ECF No. 21 at 2-3).  Woodard chose to file a PREA report instead of a grievance.  He further argues that:

> there is no need to satisfy PLRA in this pro se Plaintiff's mind due to the fact that rape is a crime and not a prison condition[,] conspiracy to commit rape is a[n] actual crime and not a prison condition, assault is a crime, and not a condition, conspiracy to commit assault is a crime & is not a condition.  Conspiracy to cover up the aforelisted crimes is a violation of the laws of the Unites States and not a simple condition of the prisons.  (ECF No 20 at 8-9).

In his summary judgment response, Woodard also alleged, for the first time in the case, that correctional officers denied him access to grievance and complaint forms.  (ECF No. 20 at 5).  Specifically, Woodard alleged he was denied access to phones and "[a]ll correctional officers refused access to all forms of official type paper forms for making request or filing complaints & or grievances."  (*Id.*).  Woodard did not attach a copy of his PREA report to his summary judgment response.

On September 24, 2018, the undersigned filed a Report and Recommendation finding, as a case of first impression in this Circuit, that the PREA process could not act as a substitute for the ADC grievance process.  (ECF No. 25).  The undersigned further found that Woodard's incorrect belief that the PREA report could be used in place of the ADC grievance process did not excuse his failure to exhaust his administrative remedies, and that he was not prevented from utilizing the grievance process.  (*Id.*).  It was recommended that Defendant McGhee's Motion for Summary

Judgment be granted, and that Plaintiff's Complaint be dismissed with prejudice as to all Defendants. (*Id*. at 8).

Woodard filed his objections to the Report and Recommendation on November 11, 2018. (ECF No. 29). In his objections, Woodard admitted "he did not file any grievances." (*Id*. at 3). He states he requested "complaint forms, request forms, grievances, and also requested the phone." Specifically:

> The Plaintiff could not file any paperwork related to any type of complaint. This Plaintiff requested at every available opportunity any form that was available including grievances. No correctional officers, no medical staff, no ADC employee, and no mental health staff would provide any form to this plaintiff. (1) correctional officer provided a rollaround, portable phone at this Plaintiff's request to call PREA and this Plaintiff also called his family at that same time to request help. (ECF No. 29 at 3).

In a declaration attached to his objections, he states "[a]ll ADC staff members refused or failed to provide this Plaintiff with any and all official forms for making request, filing complaints, or grievances." (ECF No. 29-2 at 1). Woodard also states he requested unit level grievance forms on at least six different occasions from at least six different ADC employees and "at no time while I was in East Isolation did I receive any grievance forms, or any inmate request forms . . ." (*Id*. at 1-2). He alleges he was not able to access any grievance forms until he was released from East Isolation, which occurred "a minimum of 30 day[s] after the attack." (ECF No. 29 at 6). He did not attach a copy of his PREA report to his objections.

Defendant McGhee filed a response to Plaintiff's objections on November 30, 2018. (ECF No. 30). He argues Woodard had access to the grievance process while in East Isolation but failed to use it. He notes that McGhee was the only named Defendant working in that area; there were non-party officers available; and, during the two-week period in question, 56 grievances were filed by other inmates in East Isolation, showing that grievance forms were available. (*Id*. at 2-3).

4

McGhee further notes that, even if Woodard were denied forms while in East Isolation, he could have filed a grievance and documented the refusal to provide forms when he was released from Isolation and did not do so. (*Id*. at 3). McGhee also addressed Woodard's PREA report and noted that, even if a PREA report could substitute for the formal ADC grievance process, Woodard's PREA report in this case could not do so because it contains a completely different set of facts than his allegations in this case, and Defendant McGhee is not mentioned anywhere in Woodard's PREA report. (*Id*. at 5). Defendant McGhee attached a copy of Woodard's PREA report and the PREA investigation documents to his response. (ECF No. 30-3).

On February 1, 2019, the Honorable Susan O. Hickey declined to adopt the Report and Recommendation because Woodard asserted he was prevented from using the ADC grievance process in both his response to Defendant McGhee's motion for summary judgment and in his objections to the Report and Recommendation. (ECF No. 31). Judge Hickey noted that the objections were provided on a handwritten, signed, and sworn declaration. She further noted that Woodard's response to the summary judgment motion was dated, signed, and sworn under penalty of perjury. (*Id*. at 3). Due to these sworn assertions, Judge Hickey found that a genuine issue of material fact existed as to "whether Plaintiff was kept from utilizing the ADC grievance procedure, and accordingly, whether he had any available administrative remedies." (*Id*. at 4).

On May 17, 2019, Defendant McGhee filed his Motion to Reconsider Exhaustion, citing recently discovered evidence in the case. (ECF No. 42). A copy of Woodard's PREA report was attached to the motion. (ECF No. 42-3). Defendant McGhee argued that summary judgment on the issue of exhaustion should be granted in his favor on reconsideration because: (1) Woodard had access to Inmate Request forms; (2) Woodard submitted an Inmate Request Form within 15 days of the alleged attack and while he was in East Isolation, and that submission did not mention

any issues with obtaining a grievance form; (3) Woodard could have used that Inmate Request Form to request a grievance form or in-person interview concerning the alleged assault and did not do so; (4) Woodard could only name one individual who allegedly denied him a grievance form; and, (5) Woodard admitted during his deposition that he did not inform ADC officials investigating the alleged assault that Defendant McGhee was involved.  Thus, Defendant McGhee argued, Woodard had access to the ADC grievance process and chose not to use it.  (ECF No. 43 at 1).

On September 18, 2019, the undersigned filed a Report and Recommendation regarding Defendant McGhee's motion for reconsideration.  (ECF No. 53).  It was recommended that Plaintiff's Complaint be dismissed for four reasons.  First, a PREA report cannot serve in place of a grievance under the ADC Grievance Procedure.  (*Id*. at 6-10).  Second, the PREA report describes completely different facts, and involves completely different people, than those alleged in Woodard's Complaint.  Woodard's PREA report identified a single black inmate and a Hispanic correctional officer named Artago Isabello as being involved in the alleged sexual assault. Completely missing from Woodard's PREA report is any mention of Defendants McGhee, Greenway, and the gang of assaultive John Doe inmates as described in Woodard's Complaint. (*Id*. at 10-11).  Third, based on the record presented to the Court, Woodard had many opportunities to avail himself of the ADC Grievance Process, both while he was in East Isolation and upon his release into the general population, and he chose not to do so.  (*Id*. at 11-15).  Fourth, because Woodard did not identify McGhee in the PREA report, he prevented ADC officials from investigating his claim and thwarted the underlying policy rationale for PLRA exhaustion.  (*Id*. at 15-16).

On November 8, 2019, Woodard filed his objections to the Report and Recommendation. (ECF No. 56).  He asked that the undersigned be removed from the case, and he claimed he had

6

been denied "any and all discovery" for the case.  (*Id*. at 2-3).  He objected to the use of the Inmate

Request Form as evidence that he had access to paperwork and forms while in East Isolation.   He

said that "for a price, Inmate Porters will bring inmates housed in Isolation anything and inmates

will help other inmates." (*Id*. at 4).  Woodard further alleged that grievance forms require ADC

staff signatures, and, therefore, it was worthless for inmates to bring another inmate a grievance

form.  (*Id*. at 5).  He further complained that the Court does not seem to be interested in the merits

of his case.  (*Id*. at 7).

On March 25, 2020, the Honorable Susan O. Hickey declined to adopt the Report and

Recommendation because the Inmate Request Form referenced by Defendant McGhee could have

been adduced during the pendency of the summary judgment motion. (ECF No. 57).  Judge Hickey

further noted that, if she had addressed the merits of the motion for reconsideration, "Plaintiff's

completion of one Inmate Request Form, in which he did not request a grievance form, does not

definitively show that Plaintiff had access to grievance forms whenever he did request them." (*Id*.

at 6).  Judge Hickey referred the case to the undersigned to conduct an evidentiary hearing to

determine whether Woodard had complied with the PLRA's exhaustion requirement.  (*Id*. at 6-7).

The evidentiary hearing was first set for June 30, 2020.  (ECF No. 61).  Because Defendant

McGhee's counsel was unavailable on that date, the hearing was rescheduled for August 21, 2020.

(ECF No. 64).  Due to ongoing COVID-19 concerns and restrictions, the hearing was then

rescheduled to be held by Zoom teleconference on September 29, 2020.  (ECF No. 71 at 1-2).

Some discussion of the procedural history leading up to the evidentiary hearing is

necessary.  Woodard filed his Pre-Hearing Information Sheet on July 22, 2020.  (ECF No. 69).

Because he did not provide a brief description and the anticipated length of testimony for each of

his requested witnesses, as directed in the Amended Hearing Scheduling Order, the Court entered

an Order directing him to do so no later than August 6, 2020.  (ECF No. 71 at 2).  On July 29, 2020, Woodard filed a motion requesting copies of all documents filed in the case from June 20, 2020 to present, which was granted.  (ECF No. 73).  On August 13, 2020, Woodard filed an Amended Motion for Copies, stating that he needed copies of all documents filed in the case from June 20, 2019, not from June 20, 2020, as he had originally requested.  (ECF No. 76).  This motion was also granted.  (ECF No. 77).

Woodard then filed his Amended Pre-Hearing information sheet on August 5, 2020.  (ECF No. 74).  In it, he listed 15 ADC Inmates as proposed witnesses.  For each inmate he stated, with some slight non-substantive variations to the text, that they will testify to the "difficulty in getting grievances and pens and signatures and delaying tactics of many correctional officers in filing grievances."  (*Id*.).  Finding that having 15 inmates testify to the same points was cumulative, the Court on August 21, 2020 ordered Woodard to choose three witnesses, other than himself, to testify regarding these points.  (ECF No. 75).

Rather than obeying the Court's Order and identifying his three witnesses, Woodard instead filed a Motion to Quash the Court's Order, arguing that he should be permitted to proceed with all 15 proposed witnesses.  (ECF No. 78).  As grounds, Woodard stated that he needed all 15 witnesses, which were chosen based on a roster from the isolation unit, because he "is unaware if any of the proposed witnesses even asked for a grievance or a pen, all of the (15) potential witnesses may have had no issues at all. . . "  He stated that the testimony of each witness "will be a surprise to the Plaintiff."  (*Id*. at 3).  He further alleged he was "denied any form of discovery." (*Id*. at 2).  Defendant McGhee filed his response in opposition on September 2, 2020, noting that Woodard's allegation that he was denied the opportunity for discovery was false, and attaching discovery documents in support.  (ECF No. 79).  Plaintiff's Motion to Quash was denied, and

8

Woodard was given the opportunity to provide the identity of his three witnesses no later than September 25, 2020. (ECF No. 82). Defendant McGhee filed an Amended Pre-Hearing Witness list on September 22, 2020. (ECF No. 83). Woodard submitted his list of three witnesses on September 25, 2020. (ECF No. 85).

The evidentiary hearing was held by Zoom teleconference on September 29, 2020. (ECF No. 90).

### Testimony on Behalf of Plaintiff

ADC inmates Happy Mystik Stompingbear a/k/a/ Chris Ward, Michael Jackson, and Steven Hayes testified on behalf of Plaintiff. (ECF No. 90). At the beginning of the hearing, Defendant McGhee requested that their testimony be excluded because none of these inmates had been in the ORCU East Isolation Unit at the time Plaintiff was housed there relevant to this alleged assault. This request was denied.

Inmate Happy Mystik Stompingbear testified he has had trouble getting a grievance in the hole[1] "pretty much every time." He agreed that ADC staff has taken pens from him, but his trouble is getting them to pick up grievance forms and sign them because they just never come back. As a result, he "stockpiles" grievance forms because staff does not give them to you, and he said he had missed grievance deadlines in the past. On cross-examination, Stompingbear agreed he has filed upwards of 30 grievances while housed in ORCU. In response to a question from the undersigned, Stompingbear said he stockpiles grievances by placing them in his property. It was also clarified that the list of Stompingbear's grievances provided by Defendants did not indicate

---

[1] "The hole" is an informal term for isolation or solitary confinement. https://www.merriam-webster.com/dictionary/the%20hole (last accessed Oct. 29, 2020).

Stompingbear's housing status or location (i.e., whether he was in isolation or general population) when they were made.[2]

Inmate Michael Jackson testified that it is "always" a problem getting a grievance in the hole. He has also had issues with getting a pen and getting a grievance signed by ADC staff. He said they take everything from you when you go to isolation. On cross-examination, though, Jackson agreed he filed a grievance while in ORCU East Isolation in March 2019 and two grievances while in ORCU West Isolation in July 2019. He also agreed that he has filed upwards of 20 grievances while at ORCU. On re-direct, he stated that just because he was able to file one or two grievances does not mean that he did not want to file more grievances. On re-cross, he admitted he could have asked for an Inmate Request Form if he wanted to file four grievances instead of two; however, he said all documents were hard to get "back there," so he tries to keep a grievance and an inmate request form in his pocket. He also stated that staff gave excuses such as being short-staffed for not bringing documents to inmates in isolation. Thus, once he used the ones he had in his pocket, it was difficult to get any other documents in Isolation.

Inmate Steven Hayes testified he has had difficulty getting grievance forms; getting and keeping pens; and, getting an officer to sign a grievance while in the hole. On cross-examination, he agreed that he had filed "a lot" of grievances while housed in ORCU, certainly more than 30. He also agreed that he filed three grievances while in ORCU West Isolation in April 2017, noting that he had only been in East Isolation once. He also agreed that an inmate can use an Inmate Request Form to ask for a grievance form, but only if you can get the Inmate Request Form.

Woodard initially declined to testify on his own behalf, but he decided to do so after the undersigned explained that this was his opportunity to make a narrative statement concerning his

---

[2] A separate housing record was not provided for this inmate.

case. He testified that July 2016 was his first time in isolation and only his second time in the ADC. He said there were no pens. He kept asking guards for paperwork, for grievances and request forms, but nothing happened. He stated he just got out of the hole about two months ago, and now they bring a pushcart around daily with grievance and request forms. In 2016, you could beg and plead, but nothing happened.

On cross-examination, Woodard agreed that in his objections (ECF No. 29) to the summary judgment Report and Recommendation he alleged he had no access to forms of any kind while in East Isolation. He was asked to read from pages 3, 6, and 14 after agreeing the objections were in his handwriting. On page 3, he read: "This Plaintiff requested at every available opportunity any form that was available including grievances. No correctional officers, no medical staff, no ADC employee, and no mental health staff would provide any form to the Plaintiff." (*Id*. at 3). On page 6, he read: "This Plaintiff still maintains that the correctional officers all failed to provide any official forms that are for filing complaints or making request or filing grievances." (*Id*. at 6). On page 14, he read "ADC staff failed to provide this Plaintiff with any grievance forms nor with any other requested complaint or official request forms." (*Id*. at 14).

He also agreed he submitted an Inmate Request Form while in East Isolation, which he sent to ADC Director Wendy Kelley. He stated he did not have any access to any forms *from ADC staff* while he was in East Isolation. He was able to get the Inmate Request Form in question from an Inmate Porter, further explaining that the Inmate Porters "who steal things" from property when the staff takes everything from you upon arriving in isolation, can also bring things to inmates in isolation, such as forms, or pens, or coffee. He said an Inmate Porter slid him the Inmate Request Form. Woodard testified that, prior to this hearing, he had not mentioned that an Inmate Porter gave him the Inmate Request Form. Plaintiff agreed that he submitted a PREA report. He also

11

admitted the Inmate Request Form and PREA report were written with a pen and submitted less than 15 days after the alleged sexual assault.

Defendant McGhee's counsel referred to pages 17 (ECF No. 42-1 at 3) and 64[3] of Plaintiff's deposition testimony.  On page 17, Woodard was asked which ADC staff he spoke with. Plaintiff testified in the deposition:

> It was in the hole, and I have no idea what their names were.  I'd asked for grievances, I'd asked for paperwork, I'd asked for any kind of paperwork just to file something.  I asked for telephones.  I'd ask for anything just to contact my family after this had happened, and I never got anything.  (ECF No. 42-1 at 3).

On page 64 of his deposition, Woodard was asked if, prior to filing his complaint in this case, if he had told any of the ADC staff, in any incident report, or at any time going to medical, that Defendant McGhee was involved in the alleged assault.  Woodard testified he told someone at every place, including the nurse.  He testified: "Every single one.  Same way I never got any grievance forms, never got any paperwork that I asked for."

Woodard agreed he met with the Chaplain.  The Chaplain asked him if he needed anything, and Woodard told him he did not.  He also recalled talking to two ADC officers investigating his PREA report and telling them that he did not want to speak to them without a lawyer present.  He testified, however, that his refusal to speak to them did not matter because it was outside the 15-day deadline to file a grievance.  Woodard did not file any grievances when he was released from East Isolation into general population because it would have been outside the 15-day deadline.  He believed he was in East Isolation for 30 days.

Woodard stated that there was no point in talking to the Chaplain or the two officers because it was outside the 15-day deadline and "they are real sticklers for the 15 days."  He also

---

[3] It does not appear that this page of the deposition transcript is in the Court docket. The page was captured from the Zoom video instead, starting at 1 hour, 4 minutes, 22 seconds.

said the PREA report was completed outside the 15 days.[4]  He repeated that the one Inmate Request Form he was able to get was obtained from another inmate because he was not getting any satisfaction from ADC officers.

The undersigned asked Woodard several questions to clarify his testimony.  He again confirmed he obtained the Inmate Request Form from another inmate while he was in Isolation, and that he received the form within the 15-day deadline.  When asked about the PREA report, he testified that an ADC officer brought it to him, but he was not sure who that officer was.  The officer came to see him and had him fill it out.  When asked how many times he requested a grievance form, Woodard testified he did so "at least twice every shift, two shifts every day, for 20-25 days." (Video at 1 hour, 21 minutes).  Various officers were asked, he said, but all refused. The undersigned pointed out that each denial of a grievance started a new 15-day deadline period, and Woodard was asked if he ever filed a grievance once back in general population.  He said he just did not think about it.  When asked if there was any other reason, he stated he did not think it would do any good and he did not want to relive it.

Woodard testified he asked Deputy Warden Musselwhite for a grievance "well within the 15-day deadline." (Video at 1 hour, 24 minutes).  He stated Musselwhite used to do walk-throughs of Isolation with upper-echelon staff, and he had a conversation with him within the 15 days, but he never got a grievance form following the conversation.  Woodard admitted he did not ask either the chaplain or the two investigators that he spoke with for a grievance form.  When asked if there was any reason for not doing so, Woodard testified, "I had already done the PREA filing, myself, the PREA filing, and I thought that was good enough because it says that it should be good enough in the way I had read it." (Video at 1 hour, 25 minutes).

---

[4] This is factually incorrect.  Plaintiff completed his PREA report on August 2, 2016, within the 15-day deadline. (ECF No. 30-3).

**Testimony on Behalf of Defendant McGhee**

Defense counsel called Terri Grigsby Brown, ADC Grievance Supervisor, who is responsible for non-medical grievances. Grigsby Brown testified that if Woodard had filed a grievance after the 15-day deadline had passed, it would have been rejected as untimely, but he could have appealed. The grievance could have been addressed on the merits on appeal even if filed late. She further noted that a PREA report and an ADC grievance are not the same thing. Under AD 14-16 an inmate who files a PREA report must still file a grievance. On cross-examination, Grigsby Brown consistently repeated that a PREA report could not be used instead of an ADC grievance.

Jason Gray, ADC Grievance Coordinator, testified that during the 15 days after Woodard's alleged sexual assault, 19 inmate grievances were filed by inmates in ORCU East Isolation.[5] He further testified that an inmate can contact him directly for an Inmate Request Form and these requests are never denied. He also stated that the PREA process does not satisfy the grievance process. There was no cross-examination.

Gary Musselwhite, former Deputy Warden at ORCU, testified that he has never denied Woodard or any other inmate a grievance form. His practice is to advise staff to provide the form if asked. He explained that inmates in isolation can get a grievance form from staff, can request an Inmate Request Form, and can request to speak to someone. He also confirmed that under AD 14-16, wardens had the discretion to answer a procedurally deficient grievance on the merits. On cross-examination, Woodard asked why Musselwhite would delegate a request to staff when he had been having trouble getting staff to bring him a grievance form in the first place. Musslewhite replied that Woodard could have told him that staff were still not complying after they had been

---

[5] He noted that a prior count of 56 grievances was a report run for both July and August.

ordered to do so. He further stated that, if he had gotten an Inmate Request Form like the one

Plaintiff sent to Wendy Kelly, he would have sent someone to talk to Woodard. On re-direct,

Musselwhite indicated that many of the inmates in isolation have pens. He further stated that ADC

staff must follow his orders.

Chaplain Jerry Wilson confirmed that Woodard initially refused to speak with him, but he

testified that he prepared a PREA report based on his later interview with Plaintiff. During the

interview, Woodard did not tell the Chaplain he was unable to obtain a grievance form. If Woodard

had asked for a grievance form, the Chaplain would have given him one immediately.

Emmer Branch was one of the ORCU officers who investigated Plaintiff's PREA report.

She is now a Deputy Warden at the Tucker Unit. She met with Woodard on August 2, 2016.

During that meeting, Woodard said nothing about being denied grievance forms. On cross-

examination, Branch stated that if he had asked for a grievance form, he would have gotten one.

### Plaintiff's Closing Remarks

To ensure that Woodard's points on closing[6] are accurately represented in their totality,

they are set forth below verbatim[7]:

> A lot of these points that the Defense is bringing up, they are, I know they are part
> of procedure, I know they are part of the technicality thing and there are rules that
> have to be followed. I understand that. I mean, I'm in prison. There are a lot of
> rules that need to be followed. A lot of these things are simple technicalities and I
> believe some things should be decided on the merits. I was attacked in 2016. I had
> never filed a grievance before then. And there are some things that just can't be
> overlooked. I'm not going to split hairs trying with anybody. I'm not trying to hide
> anything. I'm just trying to get a little justice. You understand? I've been nervous
> all day today, I don't do good under pressure, especially sitting here looking at a
> federal judge. And I didn't get to call some good witnesses that I wanted to call,
> you know that. The three witnesses I did call, I think they did pretty well.
>
> But, the main thing is, your Honor, I did the best I could with what I had to work
> with at the time. I asked and asked and asked for grievances. And they can sit here

---

[6] Plaintiff's closing began at approximately the 2 hour, 40 minute, 50 second mark on the video.
[7] Pausing words like "um" or "ah" were left out for clarity.

and split hairs with you about I should have filed a grievance about not getting a grievance. And that's, that's, true enough, nowadays I would have. Nowadays I will. Nowadays if I don't get something that I need to have do, I do. But at that point in time, your Honor, I was definitely glad to get out of the hole and survive the incident in one piece. Do you understand what I'm saying? It was not a pleasant thing, it was not something I like to admit happened, not something any guy likes to admit happened to him. So, once I got out of the hole I never wanted to acknowledge it happened, I just wanted to get away from it. So no, I didn't file a grievance about not getting a grievance. I didn't do that.

But when I did file this suit, I just wanted a little bit of, a little bit of justice, so, I didn't plan on dotting all my T's, dotting my I's and crossing my T's. I didn't get the grievance forms I asked for. I did end up winding up getting one Inmate Request Form. One request form. (Plaintiff pounds on table to emphasize the word one.) And with the one Request Form, your Honor, I sent it to the only person that I thought that had no good old boy syndrome down here, no good old boy this and that and the other, no good old boy slap on the back thing. I sent it to Wendy Kelley, a woman, in charge of a prison, that I thought would get some action for me. That's all I could do.

I wanted to get out of this prison into somewhere else. And I wrote that request form and I gave it to an inmate and had him take it out to the box and put it in that box for me and send it off for me. That's the only thing I need to do. And that's why I feel like I should get some justice, your Honor.

### Defendant McGhee's Closing Remarks

Defense counsel emphasized the following points on closing:

- Woodard had access to grievance forms. He had access to nine staff members per day, and during that same time 19 other inmate grievances were filed by inmates in ORCU Isolation.

- Two of the three inmates Woodard called as witnesses were able to file grievances while they were in ORCU Isolation.

- Even if Woodard did not have access to a grievance form and other staff members during the 15 days after the alleged assault, he had access to an Inmate Request Form within that 15 days, as evidenced by his submission of an Inmate Request

Form to Wendy Kelley.  There is no mention of being denied grievance forms in that Inmate Request Form.

- Woodard testified that an ADC officer brought him a PREA complaint form while he was in isolation.

- Woodard testified that he refused to speak with the Chaplain and investigators to ask for a grievance form.

- Emmer Branch indicated Woodard did not ask for a grievance form during his PREA interview.  If he had asked for one, he would have received one.

- Gary Musslewhite testified he would have directed staff to give him a grievance form if Woodard had asked him for one, and if asked a second time he would have directly told the grievance officer to give him one.

- When Woodard was released to the general population, he could have filed a grievance about being denied grievances, and that would have been within the 15-day period.  He chose not to do that.

- Woodard has admitted he did not even attempt to follow the ADC grievance process, and to absolve Woodard of any responsibility to at least attempt exhaustion undermines the purpose of the PLRA.

### Plaintiff's Rebuttal Argument[8]

Woodard's final points are again presented verbatim:

[Defense counsel] is contending a couple of technical things.  The officers that interviewed me, all those people are still staff.  The two sergeants, the two sergeants, they're not going to do anything for you.  And that was outside the 15-day limit.  You understand?  She brought that point up several times, that I refused to talk to Chaplain Wilson and also refused to talk to the sergeants.  And also they're just, there's just.  Hang on one second.  (Judge tells him to take his time and get his

---

[8] Plaintiff's rebuttal starts at 2 hours, 49 minutes on the video.

thoughts clear.) This case is, is, for me, is real personal. The case is about the merits for me. But in order to answer some of her things about the technical things, there's just no way to fight this case on little, small technicalities. And I tried to put myself in her shoes and see the technicalities add up to one big loss. It does add up to one big loss for me, your Honor. The fact of the matter is, is, I did send the one Request Form to Wendy Kelley. No, maybe I should have sent it to somewhere in here to ask for grievances at the time. But where do I send it to in here, to ask for grievances at the time? You heard what Musslewhite said. He said he was going to send someone back to give me a grievance. But who are you going to send back to give me a grievance? The same people who have been refusing to give me a grievance? And you heard what Branch said; you seen the attitude she started to get when I even questioned her. It wasn't just me. But I asked her where she interviewed me at, and she didn't even remember where she interviewed me at. I asked her if she was going to go up to her office and bring me one back, and she couldn't even respond to that. She's going to order someone to bring one back to me. But the same people you are going to order to bring something back to me are the same people who have been refusing to bring it to me to start with, your Honor! So, it's a no-win situation for me.

The only thing I'm guilty of is not filing a grievance on getting a grievance when I got out. That's the only thing I'm guilty of – not filing a grievance on a grievance for not getting a grievance. I filed a PREA report. And I was under the understanding that that covered filing instead of filing a grievance. And it says plainly in there you may file a PREA report instead of a grievance, and I've argued that from the word go. I don't have that particular argument with me, but it was in some of my defenses to the summary judgments.

But that's just a mere technicality, and it may be enough of a technicality that her argument wins out. If that's so, then so be it. But I feel like that if you refuse me the grievances you refuse me due process. Because I wasn't able to fill it out. And you've heard from these other witnesses that I've brought that it is hard to get grievances. And these guys aren't lying to you, your Honor. I had a list of 15 witnesses. I had no idea what they were going to say, but I guarantee you one or two of them would have said the exact same thing that I said – that they deny us the grievance process a lot of times. Not everyone is denied the grievance process, but if I've got a story to tell to you and these officers don't want us to tell these stories sometimes, they refuse the grievance process. Period. End of subject. They do. And it's just not right, your Honor.

## II.    LEGAL STANDARD

Several courts of appeal have held that questions of fact regarding exhaustion of administrative remedies are for the court to decide. For example, in *Dillon v. Rogers*, 596 F.3d 260 (5th Cir. 2010), the Fifth Circuit noted that the Seventh, Ninth, and Eleventh Circuits all agreed

that judges may resolve factual disputes concerning exhaustion of remedies without the participation of a jury. *Id.* at 271 (citing *Pavey v. Conley*, 544 F.3d 739, 741-42 (7th Cir. 2008); *Bryant v. Rich*, 530 F.3d 1368, 1373-77 (11th Cir. 2008); *Wyatt v. Terhune*, 315 F.3d 1108, 1119-20 (9th Cir. 2003)).

The *Dillon* court stated:

> [T]he factfinding powers of judges is not limited to addressing subject matter jurisdiction. It also extends to deciding factual questions concerning certain affirmative defenses like personal jurisdiction and venue, which may be waived by a defendant. Exhaustion resembles personal jurisdiction and venue in that it is an affirmative defense that allows defendants to assert that plaintiffs have not invoked the proper forum for resolving a dispute. The Supreme Court has described exhaustion in similar terms, as a "rule of judicial administration" controlling access to the courts, akin to the doctrines like "abstention, finality, and ripeness . . . that govern the timing of federal-court decisionmaking." *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992). Since exhaustion is a threshold issue that courts must address to determine whether litigation is being conducted in the right forum at the right time, we conclude that judges may resolve factual disputes concerning exhaustion without the participation of a jury.

*Dillon*, 596 F.3d at 271-72 (citations omitted); cf., *Foulk v. Charrier*, 262 F.3d 687, 698 (8th Cir. 2001) (affirming holding of the district court that defendant did not meet its burden of establishing the affirmative defense of failure to exhaust). See also *Small v. Camden County*, 728 F.3d 265, 269–70 (3d Cir. 2013) (plaintiff in a lawsuit governed by the PLRA is not entitled to a jury trial on the issue of exhaustion).

The undersigned finds this reasoning persuasive and will treat this threshold issue as one to be resolved by the Court.

### III.    ANALYSIS

Woodard presents two separate arguments as to why he failed to submit an ADC grievance concerning the alleged sexual assault in July 2016. The undersigned finds one of these to be credible, while the other is not.

### A.    PREA Report Instead of a Grievance

The first argument presented is stated in Woodard's Complaint, was argued in his response to the motion for summary judgment, and it was revisited in his evidentiary hearing testimony. This argument is that Woodard did not file an ADC grievance form because he chose to file a PREA report instead and believed that to be sufficient. During the evidentiary hearing, when asked if there was any reason he did not ask the Chaplain or the PREA investigators for a grievance form, other than the belief that he was outside the 15-day deadline for grievances, Woodard replied, "I had already done the PREA filing, myself, the PREA filing, *and I thought that was good enough because it says that it should be good enough in the way I had read it*." (Video at 1 hour, 25 minutes). In his closing remarks, Woodard repeatedly characterized the PLRA exhaustion requirement as a "mere technicality." He argued: "I filed a PREA report. And I was under the understanding that that covered filing instead of filing a grievance. And it says plainly in there you may file a PREA report instead of a grievance, and I've argued that from the word go." (Video at 2 hours, 51 minutes).

This first argument, while mistaken, is credible. Woodard has consistently raised this as his primary argument "from the word go" in this case. He emphasized it again during the evidentiary hearing, asking the Court not to dismiss his case on a "mere technicality." Further, his confusion on this point is somewhat understandable because while the ADC grievance policy clearly states that a grievance must be filed to exhaust administrative remedies, the PREA policy does not cross-reference the ADC grievance process. Nevertheless, as discussed below, submitting a PREA report does not serve as the filing of a grievance for PRLA exhaustion purposes.

Whether a PREA report may be used in place of a prison grievance procedure to exhaust the PLRA administrative exhaustion requirement is a question of first impression in the Eighth

Circuit. The Ninth Circuit and the federal district courts which have addressed this question, including this District, have uniformly held that a PREA report does ***not*** replace a prison grievance procedure for the purposes of satisfying the PLRA exhaustion requirement. *See, e.g., Porter v. Howard*, 531 F. App'x 792, 793 (9th Cir. 2013) (PREA does not excuse inmate from requirement of filing and exhausting an administrative grievance to satisfy PLRA); *Bledsoe v. McDowel*, No. 4:16-cv-4057, 2017 WL 1091332, at *3-4 (W.D. Ark. Mar. 21, 2017) ("Plaintiff's PREA complaint cannot substitute in place of a properly filed grievance as outlined in the ACC's grievance procedure"); *Barringer v. Stanley*, No. 5:16-CV-17-FDW, 2017 WL 1028595, at *3 (W.D.N.C. Mar. 16, 2017) ("initiation of an action under the PREA simply does not satisfy the requirements for exhaustion of administrative remedies"); *Omaro v. Annucci*, 68 F. Supp. 3d 359, 364 (W.D.N.Y. 2014) ("Nothing in the text or legislative history of the PREA suggests that it was intended to abrogate the PLRA's exhaustion requirement."); *Lamb v. Franke*, No. 2:12-CV-00367-MO, 2013 WL 638836, at *2 (D. Or. Feb. 14, 2013) ("The PREA does not impose an alternative remedial scheme, nor does it supersede PLRA's exhaustion requirement.").[9]

There appear to be only two instances where district courts have permitted a PREA report to be used to meet the PLRA exhaustion requirement, and both were dependent on the specific language of the prison grievance policy in question. The first occurs when the prison grievance policy contains explicit language deeming a PREA report as sufficient to meet the PLRA exhaustion requirement. In this instance, completion of the prison grievance procedure is not

---

[9] *Accord Parry v. Muller*, No. 18-cv-1394-JPG, 2018 WL 4027572 (S.D. Ill. Aug. 23, 2018); *Howard v. Rodgers*, No. 17-3019-DDC-TJJ, 2018 WL 3122175 (D. Kan. June 26, 2018); *Doe 8 v. Snyder*, No. 17-11181, 2018 WL 1035715 (E.D. Mich. Feb. 23, 2018); *Oien v. Oregon*, No. 2:17-cCV-00978-HZ, 2018 WL 503259 (D. Or. Jan. 22, 2018); *Kelsic v. Terrel*, No. 14CV3342SLTLB, 2017 WL 2560923 (E.D. N.Y. June 13, 2017); *Farmer v. Otter*, No. 1:14-cv-00345-BLW, 2015 WL 5595497 (D. Idaho, Sept. 22, 2015); *Turnquist v. Raney*, No. CV 13-87-BLG-CSO, 2015 WL 4528572 (D. Mont. July 27, 2015); *Rivera v. Drake*, No. 09-C-1182, 2014 WL 12526621 (E.D. Wisc. Feb. 11, 2014); and, *Porter v. Howard*, No. 10CV1817 JLS (PCL), 2012 WL 2836637 (S.D. Cal. July 10, 2012).

required for PLRA exhaustion.  *See e.g. Medina v. Kaplan*, No. 16-CV-7223 (KMK), 2018 WL 797330, at *5 (S.D.N.Y. Feb. 8, 2018) (pursuant to the corrections regulations, "any allegation concerning an incident of sexual abuse or sexual harassment shall be deemed exhausted if official documentation confirms that the inmate reported the incident to facility staff") (internal quotations and alterations omitted).  The second occurs when the grievance policy in question explicitly prohibits an inmate from using the grievance process to report PREA complaints.  In this circumstance, the grievance process is considered unavailable.  *See Pearson v. CoreCivic*, 3:17-0485, 2018 WL 3354919, at *6 (M.D. Tenn. May 2, 2018), *report and recommendation adopted sub nom. Pearson v. CoreCivic, Inc.*, No. 3:17-CV-00485, 2018 WL 3348732 (M.D. Tenn. July 9, 2018) (the policy at the facility stated "alleged PREA incidents will not be processed through the facility's inmate/resident grievance process.").

Neither of these two circumstances are present in this case as the explicit language in AD 14-16 clearly encompasses sexual assault within the ADC grievance procedure.  AD 14-16 describes a three-step process where the inmate first files an informal written complaint as Step One on a Unit Level Grievance Form.  Step Two requires the submission of a formal written complaint, using the same form used for Step One.  Step Three requires the inmate to submit a written appeal to the Chief Deputy, Deputy, or Assistant Director.  (ECF No. 15-1 at 1-2).  An inmate grieving a sexual assault may bypass Step One:

> (Note: Inmates alleging sexual assault, physical abuse, or sexual misconduct/harassment by staff is [sic] not required to complete step one, but should file a formal grievance (step two) directly to the warden.)

(ECF No. 15-1 at 2).  Sexual assault, physical abuse, and sexual misconduct are considered emergency grievances.  (*Id*. at 2, 6).  A section labelled "Prison Litigation Reform Act Notice" advises inmates of the consequences of failing to complete the grievance process:

> Inmates are hereby advised that they must exhaust their administrative remedies as to all defendants at all levels of the grievance procedure before filing a Section 1983 lawsuit and Claims Commission claim. If this is not done, their lawsuits or claims may be dismissed immediately. (ECF No. 15-1 at 17).

There are no references to the PREA or the ADC PREA policy in AD 14-16.

Thus, based on the plain language of ADC 14-16, the submission of Woodard's PREA report is not sufficient to satisfy his PLRA administrative exhaustion requirement.

### B.    Obstacles to Filing a Grievance

This leaves Woodard's second argument that he was completely denied access to all forms and paperwork by ADC staff for the entire time he was housed in ORCU East Isolation. This argument was raised for the first time in his response to Defendant McGhee's summary judgment motion, after Defendant McGhee argued that a PREA report could not be used in place of an ADC grievance for the purposes of PLRA administrative exhaustion. Because the deadline for filing a grievance is 15 days after the incident being grieved, and because Woodard was housed in ORCU East Isolation for approximately 30 days following the incident, Woodard claims he did not have access to the ADC grievance process.[10] This argument was the focus of the evidentiary hearing held on September 29, 2020.

Woodard's three inmate witnesses all testified that it was difficult to obtain grievance forms or Inmate Request Forms while housed in isolation. They also testified it was difficult to get ADC staff to sign the grievances, as required by the ADC process. On the other hand, testimony and other evidence showed that they had filed grievances while in isolation. Michael Jackson testified he filed one grievance in March 2019 while housed in ORCU East Isolation, and two while housed in ORCU West Isolation. Steven Hayes testified he had filed three grievances while housed in

---

[10] Given the date of the alleged sexual assault on July 18-19, 2016, the undersigned notes that the 15-day deadline to submit an ADC grievance regarding the incident was August 3, 2016.

ORCU West Isolation, and he had only been in ORCU East Isolation once. The grievance records of all three witnesses, and the corresponding housing records for two of the witnesses, were presented at the hearing. (Def.'s Exhibits 1-5). Cross-referencing the grievance and housing records reveals that Jackson filed 10 grievances, and Hayes filed three grievances, while they were housed in ORCU Isolation. ADC Grievance Coordinator Jason Gray testified that inmates housed in ORCU East Isolation at the same time as Woodard filed 19 grievances. Woodard testified that Inmate Porters could provide things for inmates in ORCU Isolation, like forms, pens, and coffee, and this was how he received the Inmate Request Form he filed on August 1, 2016, while housed in ORCU East Isolation. This Inmate Request Form was sent to ADC Director Wendy Kelley and made no mention of being prevented from filing a grievance while in ORCU East Isolation.

Woodard testified in both his deposition and at the evidentiary hearing that correctional officers, medical staff, and mental health staff all failed to provide him with *any* official forms for filing complaints or requests. Yet he testified at the hearing that an ADC officer brought him the PREA report form to fill out, which he did on August 2, 2016, within 15 days of the alleged assault. Nothing was mentioned in the PREA report about being prevented from filing a grievance.

Woodard testified that he initially refused to speak to Chaplain Wilson and the two PREA investigators. He also agreed he did not ask any of them for a grievance form, saying it was irrelevant to the exhaustion question because they came to him outside the 15-day deadline. In his deposition, however, Woodard stated he saw them on July 26, July 27, and August 2, 2016, all of which were within the 15-days to file a grievance. Chaplain Wilson testified that Woodard did not ask for a grievance when he spoke with him. Chaplain Wilson's report indicates he went to East Isolation after the 15-day deadline. Emmer Branch testified she interviewed Woodard on August 2, 2016, which was within the 15-day deadline. Ms. Branch testified that Woodard said nothing

about grievances during that interview.  She stated that had Woodard asked her for a grievance form, he would have gotten one.

In contrast to such evidence, Woodard testified he asked for a grievance form while in ORCU East Isolation at least twice every shift, with two shifts every day, for 20-25 days.  He said these requests were made to various officers, that all refused to bring him one, and he never got one.  He testified that Deputy Warden Musselwhite did walk-throughs in the isolation area.  He says he had a conversation with Musselwhite and asked him for a grievance, but he never got one.  Musselwhite testified that he has never denied Woodard, or any other inmate, a grievance form; if he is asked for one, he directs staff to provide one.  He also explained that inmates can also ask for an Inmate Request Form or to speak with someone in person.  When Woodard asked Musselwhite why he would have ADC staff bring Woodard a grievance form when those same officers had been refusing to bring him one, Musselwhite testified that ADC staff must follow orders.

Woodard has consistently admitted he had access to grievance forms and paperwork after he was released from isolation into the general population, and that he could have filed a grievance at that point.  He testified he did not do so because it was outside of the 15-day deadline.  When the undersigned pointed out that each denial of a grievance started a new 15-day clock, and that he would have been within the deadline to file such a grievance when released, Woodard could only state that he didn't think about it, he didn't think it would do any good, and he did not want to relive the incident.

Thus, Woodard's second argument to explain his failure to exhaust his ADC remedies is apparently based on the existence of a broad conspiracy to deny him any type of paperwork, grievance forms, a pen, or any other assistance while he was in ORCU East Isolation, and this would involve all ADC staff in East Isolation, as well as the medical and mental health departments

in ORCU, for at least 15 days after the alleged sexual assault.  The conspiracy would require numerous ADC staff in the isolation unit to refuse a minimum of four grievance requests per day over a 20 to 25-day period, for a total of 80-100 requests.  It would also require Deputy Warden Musselwhite, Emmer Branch, the grievance coordinator, correctional officers, medical staff, and mental health staff to all refuse his direct requests for any type of grievance or request form for 15 days after the alleged sexual assault.  It would require ADC staff willing to disobey direct orders from supervisory staff.  It would require the Inmate Porters to distinguish between bringing Woodard a grievance form and bringing him an Inmate Request Form.  All of this, despite the fact that 19 other grievances were filed by inmates in East Isolation during that same time frame; that an ADC Officer did bring Woodard a PREA report, which Woodard filled out and submitted on August 2, 2016; that Emmer Branch subsequently interviewed Woodard regarding his PREA report; and, despite Woodard having access to at least one Inmate Request Form.  Belief in such a conspiracy theory strains credulity considering the testimony and evidence presented.

This second argument is largely reliant on Woodard's credibility, but due to his inconsistent allegations, contradictory testimony, and misrepresentations to the Court during the pendency of this case, he does not enjoy good credibility.

First, and most damaging, Woodard's allegations concerning the alleged sexual assault in his Complaint, signed under penalty of perjury, describe a completely different set of facts and actors than what was described in his PREA report.  Notably, Defendant McGhee, Defendant Greenway, and the gang of rapist John Doe inmates was not even mentioned in Woodard's PREA report.  Woodard's credibility is severely diminished by these completely different accounts of the alleged sexual assault, and in no way does Woodard's PREA report implicate Defendant McGhee.

Second, in his Amended Pre-Hearing Information sheet, Plaintiff requested 15 witnesses, and he stated that each of them would provide testimony concerning the difficulty of getting grievance forms, pens, and signatures on the forms while in ORCU Isolation. When directed to choose three of these witnesses due to the cumulative nature of such anticipated testimony, Woodard argued that he needed all of them because their testimony would "be a surprise" to him, and he was unaware if any of the proposed witnesses had actually experienced any issues in obtaining grievances while in isolation. Thus, Woodard deliberately misrepresented to the Court the nature of these proposed witnesses' testimony. During the evidentiary hearing, Plaintiff complained in his closing remarks that he did not get to call his "good" 15 witnesses, yet in his rebuttal remarks he again admitted that he had no idea what any of those 15 witnesses were going to say.

Third, in his objections to the reconsideration Report and Recommendation, Woodard stated that Inmate Porters can bring inmates housed in isolation request forms and pens and mail off letters and request forms, but he added that grievance forms require ADC staff to sign them and it was therefore worthless for one inmate to bring a grievance form to another inmate. He suggested, but did not specifically state, that an Inmate Porter gave him an Inmate Request Form while he was in isolation. Woodard then testified at the evidentiary hearing that he had not previously mentioned that another inmate had given him the Inmate Request Form he sent to ADC Director Wendy Kelley.

Fourth, Woodard read a portion of page 17 of his deposition testimony at the hearing. In that deposition testimony, he said that he asked for telephones or anything to contact his family after the alleged sexual assault, but "never got anything"; but, in his objections to the summary judgment Report and Recommendation, Woodard stated that a correctional officer provided a roll

around portable phone to call PREA, and Woodard called his family at the same time to request help.  Emmer Branch's Report, dated August 5, 2016, indicated Warden Faust forwarded a letter that same day from Woodard's family concerning the alleged assault.  Thus, Woodard clearly had been permitted to contact his family within 15 days after the alleged assault despite his allegations to the contrary.

Considering the record as a whole, Woodard's claim that he was systematically prevented from filing an ADC grievance regarding the alleged sexual assault is just not credible.  Based on the record before the Court, including the evidentiary hearing testimony and exhibits, Woodard was not denied access to the ADC grievance process.  Instead, he chose not to pursue the ADC grievance process, mistakenly thinking that the submission of his PREA report was good enough.  As such, Woodard failed to exhaust his available administrative remedies, as required by the PLRA, and his Complaint should be dismissed.

### IV.    CONCLUSION

Accordingly, it is recommended that Woodard's Complaint (ECF No. 1) be DISMISSED WITH PREJUDICE.

**The parties have fourteen (14) days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 13th day of November 2020.

/s/ *Mark E. Ford*

HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE

28